

**EOD**

10/29/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **GLEN GORDON GUILLET** | § | |
| xxx-xx-6636 | § | Case No. 05-10551 |
| **and CHERYLE ANN GUILLET** | § | |
| xxx-xx-5942 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| WILLIAM T. NEARY, | § | |
| United States Trustee | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 06-1029 |
| | § | |
| GLEN GORDON GUILLET | § | |
| and CHERYLE ANN GUILLET | § | |
| | § | |
| Defendants | § | |

## <u>MEMORANDUM OF DECISION</u>

This matter came before the Court for trial of the Complaint of the Plaintiff,

William T. Neary, in his capacity as the United States Trustee for Region 6 (the

"Plaintiff"), through which he seeks to deny the entry of a Chapter 7 discharge in favor of

Debtors, Glen Gordon Guillet and Cheryle Ann Guillet, pursuant to 11 U.S.C. §727(a)(2),

§727(a)(3) or §727(a)(5).   At the conclusion of the trial and upon receipt of certain post-

trial submissions by the parties, the Court took the matter under advisement.   The

following memorandum of decision disposes of all issues before the Court.[1]

---

[1]   This Court has jurisdiction to consider the Plaintiff's Complaint pursuant to 28 U.S.C. §1334
and 28 U.S.C. §157(a).   The Court has authority to enter a final judgment in this adversary proceeding

## Background

This is a dispute centered around what appears to be a Nigerian "money scam." At issue is whether the Debtor-Defendants, Dr. Glen G. Guillet, and his wife, Cheryle Ann Guillet, are the victims of such a scam or rather are willing perpetrators of fraud relating to it, such that they should each be denied the benefits of a Chapter 7 discharge.[2]

Dr. Glen Guillet, M.D. has been a family physician since 1965. In addition to conducting a medical practice through a professional association from which he drew a salary, Dr. Guillet has been involved in various business enterprises over the years, including construction design projects, activities in the import-export business, a partial ownership of an automobile dealership, a motion picture production venture, and ownership of a property management company. During the 1980s, his practice and business ventures brought him annual incomes in excess of $700,000 as he devoted up to 50% of his time and energy to his business ventures, as distinguished from his medical practice.

In the midst of all of that activity, the one thing that Dr. Guillet failed to do was pay taxes. By 1991 he had been assessed a tax liability to the Internal Revenue Service in

---

since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A) and (J).

   [2] The Plaintiff must make the proper showing as against each individual debtor. "The mere existence of the marital relationship does not determine a spouse's entitlement to discharge." *Cadlerock Joint Venture, L.P. v. Sauntry (In re Sauntry)*, 390 B.R. 848, 855 (Bankr. E.D. Tex. 2008), citing *First Texas Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1993).

the amount of $108,746.20.[3]  In an effort to address those tax assessments as well as other business-related debts, Dr. Guillet singularly filed for relief under Chapter 11 of the Bankruptcy Code on August 15, 1991 in the Southern District of Texas and subsequently confirmed a Chapter 11 plan of reorganization in April 1994.[4]

Dr. Guillet ultimately defaulted, however, on his Chapter 11 plan payments and the Guillets as a couple failed to remain current on their post-confirmation tax liabilities in the 1990s.  After IRS efforts to collect an accumulated tax balance of $1,757,317.58 covering tax years 1990-98, the Guillets negotiated an offer in compromise agreement with the IRS to settle their tax liabilities over seven years for the sum of $620,463.48 in August 2000 — the year he turned 62 years of age — which required them to pay $7,386.47 per month for the 84-month period.[5]  At the time of that agreement, the Debtor had no life insurance coverage, no retirement holdings, and no stock holdings of any consequence.

Two years later, in September 2002, upon a loss of employment by Cheryle Guillet, the Guillets defaulted on the IRS offer in compromise[6] and the entire tax indebtedness of more than $1.75 million became due and payable and subject to IRS collection activities.  From that point in time until the Guillets filed their voluntary

---

[3]  Plaintiff's Ex. 19.

[4]  Plaintiff's Ex. 21.

[5]  Defendants' Ex. 29.

[6]  Plaintiff's Ex. 25.

Chapter 7 petition in this case on April 13, 2005, they transacted their personal business through cash or money order transactions,[7] so as to avoid exposing their income stream to seizure by the IRS.[8]  The Debtors conceded that the collection activities of the IRS in early 2005 was the catalyst that precipitated the filing of their Chapter 7 petition through which they seek to discharge the unsecured, non-priority portion of their tax indebtedness. They also seek the discharge of general unsecured claims totaling more than $2.1 million, including approximately $1.3 million owed to approximately 64 individuals who had either loaned money to Guillet for, or had made direct investments in, what became known as the Regenesis project.

Throughout this tumultuous period, Dr. Guillet individually owned 100% of the shares in a closely-held corporation known as Regenesis, Inc. and served as its sole director and officer.  Regenesis had no employees and, to the extent it was involved in any operations, it operated from Guillet's home.  It was through Regenesis that, beginning in 1995, Dr. Guillet became involved in a series of events through which he admittedly transferred significant amounts of money to Nigeria over the next few years.  Such transfers form the foundation upon which this objection to discharge is based.

It is appropriate to note at this juncture the limited role of Cheryle Guillet in the

---

[7]  Plaintiff's Ex. 6.

[8]  The Defendants' bank account was used only for the direct deposit of Dr. Guillet's social security payment which was usually withdrawn immediately, but which was seized by the IRS in the first quarter of 2005.

Nigerian venture. She had been married to Dr. Guillet for 21 years at the time of trial.

She was not involved in the 1991 bankruptcy case. Because of joint returns, she remains

liable for the tax accruals from the 1990s, although she contributed much of the financial

support for the IRS offer in compromise until her job as a materials management director

at a local hospital was eliminated when the hospital was purchased by a regional medical

system. Though supportive of her husband's efforts to resolve all of their outstanding

liabilities by seeking payment of the Regenesis contract from Nigeria as described *infra*,

and though she provided some ancillary services in that effort, the evidence does not

establish that she was a major participant in that venture. She did organize the documents

that were faxed to their household from Nigeria for her husband's review and she kept

detailed records of the investments made by third parties so that they could be repaid.[9]

She did have phone conversations from time to time with Leonard Ibe and other Nigerian

connections in the absence of her husband when those individuals would call to the

Guillets' home. She, at her husband's request, together with other disinterested

individuals from outside of their family, occasionally acted as the transmitting agent for

the Western Union payment process. However, she was not involved in the creation of

Regenesis, Inc. She never personally solicited any investor for the Regenesis project,

though she was aware of her husband's activity in that area. Her honest efforts

---

[9] Of course, if she had not been diligent in this area, she and her husband would likely be subject to liability under §727(a)(3). To assert her liability for engaging in recordkeeping when a failure to do so would have equally subjected her to liability is a bit disingenuous.

contributed to the substantial amount of information that we do know about this project. Thus, upon consideration of the evidence tendered and the applicable standards cited *infra*, the Court finds that the Plaintiff has failed to demonstrate by a preponderance of the evidence that the discharge of Cheryle Ann Guillet should be denied under any of the proposed subsections of §727(a). Accordingly, judgment shall be entered in her favor and the remainder of this memorandum shall focus upon the activities of Dr. Guillet[10] in the Nigerian venture and the complaint against him arising therefrom.

The description of events hereafter described involving Dr. Guillet, Regenesis and the purported Nigerian business connections is based almost exclusively upon the oral testimony of Dr. Guillet and the documents he has produced — a recitation which the Plaintiff did not (and, realistically, could not) dispute with contradictory evidence. While the Defendants sought to introduce hundreds of documents that on their face purport to originate from Nigerian or other foreign sources and that correspond to the chronological storyline to which Dr. Guillet testified, the Court ruled prior to trial that, because the Guillets could not produce any evidence of authenticity that would verify the existence of any of the people or entities that purportedly authored the foreign documents, such documents could not be admitted to create any inference that Dr. Guillet was actually involved in business dealings with actual Nigerian or European entities or nationals, but that the documents would be admitted for the limited purpose of allowing Dr. Guillet to

---

[10] Hereafter, any reference to "the Debtor" is a reference to Dr. Guillet.

demonstrate the existence of such documents and the effect which such documents had upon his mental state and his corresponding actions.[11]  The information contained in the following subsection should be considered as findings of fact only as to the actions of Dr. Guillet and the mental state with which he took such actions.  They do not constitute findings that Dr. Guillet actually engaged in legitimate negotiations with, or took legitimate directions from, authorized officials or individuals from any foreign entities or institutions.

*The Doctor's Nigerian Nightmare.*

In 1995, Dr. Guillet met with a man named Saíd Bucaros, an earlier business acquaintance, while on a trip to Europe.  Bucaros represented to Guillet that he was now acting as an intermediary for the government of Nigeria with various foreign contractors and asserted that he had recommended Guillet to an engineer in Nigeria named Solomon about a future business opportunity.  Since the Nigerian government purportedly would only work with corporate entities, Dr. Guillet pursued this opportunity in the name of his corporation, Regenesis, Inc.  Bucaros purportedly listed Regenesis as a "potential foreign contractor" with the proper Nigerian authorities, enabling Regenesis to contract thereafter with an entity known as the Nigerian National Petroleum Corporation ("NNPC").

---

[11]  See *Memorandum Order Sustaining in Part and Overruling in Part Plaintiff's Objection to the Admissibility of Certain Exhibits of Defendants Filed by the United States Trustee* entered in this adversary proceeding on January 31, 2008 (dkt #35).

Three years later, in 1998, Guillet was again contacted by Bucaros who was visiting in the United States at that time and asked for a meeting with Guillet in Houston. Before that meeting could occur, Bucaros apparently died in Las Vegas.  However, Guillet was subsequently the recipient of a phone call from someone purporting to be an engineer in Nigeria named Solomon.  Solomon told Guillet that he was working on an engineering portion of a project to repair the Kaduna oil refinery for the NNPC.  It was a smaller portion of a larger repair contract that had been previously awarded to a former Yugoslavian entity known as Stritchiv Engineering, which had since defaulted, and Solomon proposed that his team of engineers would complete all remaining work obligations necessary to obtain a certificate of completion for the project in exchange for 40% of the contract's $41.5 million face amount.  Solomon and his group of engineers would continue with primary responsibility for the engineering progress.  This arrangement would require no advance payment nor any work by anyone associated with Regenesis.  Regenesis would not have to pay for labor, materials, or equipment.  All of that expense would be carried and paid from the engineers' share, which Regenesis would be responsible to pay upon receipt of the contract amount.  Essentially, if Regenesis would simply handle any administrative details while Solomon's band handled the remainder of the work, Guillet, through Regenesis as a foreign contractor, would be entitled to a payment of $41.5 million from the NNPC.

Regenesis received a contract agreement from the NNPC, signed on August 15,

1998, by a Barrister Okon Peter of the Federal Ministry of Justice in Nigeria.[12]  The

contract prophetically provided:

> 13.  That all obligations must be cleared by the Client [Regenesis] before the Client can be paid fully.
>
> 14.  That the Federal Republic of Nigeria would not in any way [be] (sic) held responsible for the Client nor NNPC not being paid due to lack of understanding between both parties.
>
> 15.  That any levies by Nigeria for the benefit of NNPC have to be cleared before payment can be made.
>
> 16.  That any development levies thereinafter introduced by Nigeria which is compulsory to both local and international clients must also be cleared.

Though the initial contract referenced a smaller amount, such confusion was not unusual

at the NNPC according to Solomon, and Guillet subsequently received a "Contract Award

Certificate" that, though dated March 30, 1998, referenced that Dr. Guillet through

Regenesis Inc. would be entitled to $41.5 million under contract no. NNPC/PED/9753/98/

KADREF.[13]

The completion of the project took nearly two years, though Guillet never

requested, nor received, any type of progress report from the Nigerian engineers.  He

---

[12]    Defendants' Chronological Exhibit Disk ("DCED"), Vol. 1 at pp. 1-7.   Because of the confusing manner in which the Defendants had "organized" their massive amount of documents for trial, the Court ordered the Defendants at the conclusion of the trial to resubmit their admitted exhibits in general chronological order for the convenience of the Court.  The DECDs are the product of that attempt and, as a matter of convenience, the Court will reference the DCEDs in lieu of the Defendants' original numbering system for citations to the Defendants' admitted exhibits.

[13]   *Id.* at  9.

merely had intermittent telephone conversations with Solomon.  Guillet never met

Solomon nor any other engineer who purportedly worked with Solomon, and he has no

knowledge regarding the engineering services which Solomon and his fellow engineers

performed on the project.  By the end of 2000, in one of their numerous telephone

conversations, Guillet was informed by Solomon that the project had been completed.

That announcement was confirmed by Guillet's subsequent receipt of approved inspection

reports from the NNPC and from the Nigerian Government.

However, the contract was "amended" in July 2001 with a seven-page document.[14]

This contract contained greater detail than the original, though no negotiation ever

occurred with any Nigerian official to promulgate it.  It specified that:

> The Contractor, Dr. Glen G. Guillet (Regenesis, Inc.) agrees to supply and
> errection (sic) of petrochemicals, pipeline equipments (sic), and computer
> spare parts used for system optimization of 180,000 Monax Axial Plant "A
> to C" and computerization commissioning of oil for Kaduna Refinery
> complex to the Nigerian National Petroleum Corporation . . . .[15]

Dr. Guillet admitted at trial that he had no idea what that actually meant.  He simply

thought of himself as a general contractor and he did not concern himself with the

contractual language because he had been convinced that the engineers knew what they

had to do – though he had never met them nor been given a description of what they

---

[14]  Plaintiff's Ex. 65.

[15]  *Id.*

actually intended to do.  Further, notwithstanding the fact that the work had supposedly already been completed, the contract also confirmed the price and the payment terms in the following manner:

<u>ARTICLE 4   PRICE</u>

The total value of the contracts shall be previously agreed during negotiations and remains US$41,500,000.00 (Forty-One Million, Five Hundred Thousand United States Dollars) has been approved for final payment on contract number NNPC/PED/9753/98/KADREF.

<u>ARTICLE 5  PAYMENT TERMS</u>

It is hereby agreed by both parties, the Client, Nigerian National Petroleum Corporation (NNPC) and the Contractor – Dr. Glen G. Cuillet - (Regenesis Inc.) that payment shall be made upon satisfactory completion of the contract and not before being attested to by [a] (sic) team of experts that the execution of the contract is comparable with that of international standard and also under the terms of conditions stipulated.[16]

Thus began the long, undoubtedly exhausting, efforts of Dr. Guillet to facilitate the actual delivery of the contract funds to his bank account in Beaumont.  The extensive documentation produced by Dr. Guillet, consisting of hundreds of pages, trace this quixotic adventure and they document a frustrating series of events, actual or fictitious, under which payment appeared to be imminent on repeated occasions only to be delayed by some other snag requiring the transmission of additional sums by Dr. Guillet to

---

[16] *Id.*

Nigeria.  This is a mere sampling of the long trail of documentation produced by Dr.

Guillet.

The payment of the funds first appeared imminent.  Dr. Guillet received a number

of documents appearing to corroborate the legitimacy of the transfer.  One was entitled

"Fund Release Authority" from the Central Bank of Nigeria dated July 30, 2001,

authorizing the release of US$41.5 million, referencing the Kaduna contract and the

contract number and the banking information for Regenesis,[17] as well as a "Foreign

Payment Release Certificate" verifying the completion of the contract.[18]  He also received

a "Clearance for Release of Fund" from the Office of the Presidency of the Federal

Republic of Nigeria authorizing the $41.5 million to be paid "for settlement of all

outstanding contractual payments . . . via payment schedule for international non-oil

transfers worldwide" which also contained the endorsement of the Chairman of the Senate

Committee on External Debt Management.[19]  It is also at this stage that correspondence

began between Guillet and Alhaju Goni Askira, who claimed to be the Auditor-General of

the Presidential Audit Committee of the Nigerian Federal Ministry of Finance and

Economic Development.[20]

---

[17]  DCED, Vol. 1 at 22.

[18]  *Id.* at 24.

[19]  *Id.* at 25.

[20]  *Id.* at 26.   Guillet's first received correspondence from "Goni" dated September 10, 2001,
which read as follows:

October 2001 brought the first payment disruption.  Guillet received a copy of correspondence from the Nigerian Federal Board of Inland Revenue to the Foreign Operations Department of the Central Bank of Nigeria which directed the Central Bank to suspend any payment to Regenesis until such time as it could pay Nigerian income taxes as a foreign contractor for the years 1998-2000.[21]  But, as would become the routine, Guillet soon received encouragement that his funds were still awaiting him upon satisfaction of the outstanding debt.[22]   As other barriers presented themselves, Guillet would receive further confirmation of the availability of the contract sum and

---

Re: Payment of Your Overdue Contract Fund.

How are you?  Try to reach you on the phone but no success.  Your contract fund of US$41.5 million is ready to be credited into your account with Bank of America.

Again your fund will be release (sic) into your account without delay or further condition.  Please try and get in touch with my office so as to facilitate the transfer.  Thanks and I look forward to your reply.

Yours faithfully,

Alhaju Goni Askira
Auditor-General of the Federation.


[21]  *Id*. at 30.  Guillet testified that, after initial attempts to correct the erroneous basis upon which the taxes were assessed, he concluded that it was simply a method by Nigerian authorities to extract money from foreign contractors.

[22]  *Id*. at 31.  Guillet received a "Letter of Guarantee" dated December 18, 2001 from a Alhaji Tunde Waziri on behalf of the Debt Reconciliation Committee of the Presidency which stated:

> We therefore write to inform you as a form of gurantee (sic) that this honourable committee has made series of enquires (sic) and there are (sic) evidence beyond every reasonable doubt that, as soon as the tax shortfall is paid, your funds shall be sent immediately into your account.

> So, Dr. Guillet, I like you to take this result of our findings as a bond and you should go ahead to make arrangement (sic) for the payment.

encouragement to satisfy the latest fee, tax or assessment, particularly from Askira.  In the spring of 2002, Guillet expressed his frustration to Askira in the following correspondence:

> In response to your communication of 10 May 2002 (transmitted to me on Sunday 12 May) I have communicated to some twelve organizations/ individuals all proposing to have the final authority to control my contract payment.
>
> There is not enough time, nor paper, to elucidate the number of unscrupulous officials throughout the government that have attempted to extort or misdirect contract proceeds; I certainly hope you are not one of them, to wit:
>
> (A)     I am always asked to send all my contract details & then some upfront cash money is expected & has always ended with no response.  I have been contacted by your police, confirming that no legitimate organization needs any money from me to receive my contract proceeds; yet, it never comes.  I can only hope & pray that you are not another crook.  I am always threatened that my designated funds will be put back into the Government of Nigeria or some official's pockets which seems to be the object of the operations regardless of any directive.
> . . .
> Please send me a copy of your "authority" so that I can verify accuracy of the information.[23]

---

[23]  *Id.* at 37.  But Askira really does not respond except with encouragement in this letter some 10 days later that the $41.5 million is ready to be paid but setting forth the barrier to it:

> Re:  Final Release Order and Immediate Confirmation
>  . . . .
> Finally, you are to make the payment of US$950.00 for Income Tax Clearance for the year 2002/ Revalidation Certificate of your effected international transfer which will enable your bank (sic) track down the funds easily. . . . Also, you are to make the payment of US$950.00 only to the Chief Tax Officer of the Ministry via Western Union Money Transfer Network . . . .
>
> Be rest assured the full confirmation of your contract funds shall be made into your account on the 22th (sic) day of May and upon receipt of transfer of US$950.00.

Upon Guillet's payment of the $950, another immediate delay from Ankira:

> Your signature is not on your original contractual document
> so the funds couldn't leave yesterday. . . . Again you are
> expected to make the payment of US$1,992.00 only which is
> for the attorney fee and courier and insurance of the document
> today. . . . Congratulation in advance and thank you for
> working with the Federal Government of Nigeria.[24]

After making numerous other payments, including two payments of $41,500  to the

Nigerian Environmental Protection Agency and to an entity called NURFUND which was

also pertaining to environmental remediation regarding the Kaduna project, but after also

receiving another "Legal Clearance Certificate" from the Nigerian Ministry of Justice,[25]

while simultaneously receiving a new unsubstantiated claim for $8,500 from another

government secretary,[26] Guillet poured out his frustration to Ankira in June 2002:

> Like all other payments that have gone into someone's pocket rather than
> where it is supposed to go, because, by design, monies are to either
> government individual's tax agents via Western Union Cash or offshore
> accounts.  The Nigerian police keep telling me that no more money should
> be required for me to be paid.
>
> I don't know why I think telling you all this will get me paid; I just received
> another communication stating that all the people I am dealing with are
> frauds & they are exclusively appointed by the President or the World Bank
> to save me.
>
> I guess the money sent to you so far has just been a test to see if I would

---

*Id.* at 39.

[24] *Id.* at 44.

[25] *Id.* at 47.

[26] *Id.* at 51.

follow directions.  Approximately $500,000 has been exhausted trying to get paid.  There is no more money!

If you are real, there has to be a non-monetary solution to this dilemma via a corporate guarantee, condition swift whereby my bank will have an irrevocable pay order upon receipt of the funds to clear out any more crooks.

This should be possible; I must assume that if you, Goni, are truly the Auditor-General, you can find a solution.[27]

With a prompt response from Ankira that the President of Nigeria himself has

approved Regenesis for payment within a week, Guillet responded:

I want to believe you more than anything you can imagine.  Is there any tangible way you can prove to me that you are capable of wiring my contract funds?  Have you successfully sent other funds under your direction?  Can someone else always stop the transfer with one bogus claim or another, as has always happened to me?  The Paymaster told me the stop payment claim was false but was used like all the others to extort more money.  He said that they would pay me out of some special oil account they had & their banker would see to it that they were paid.

I was to have been paid over a year ago.  How is it that new fraudulent claims only appear over & over again only when my funds are to be transferred that never existed before?  If they can ignore the bogus claim, why can't you?
    . . .
I will be 64 years old . . . .  I have a wife, three children and five grandchildren.  My personal business reputation is ruined because of this, as I have not been able to meet my personal obligations.
I pray for you and your family that you are who you say you are, that someday you will be free of this mess.  If you are truly the Auditor-General, surely you must know of a way for this travesty to end.[28]

---

[27] *Id.* at 52-53.

[28] *Id.* at 57-58.

**-16-**

Ankira immediately responded with another encouraging word:

> I told you at this stage, your contract transaction is very sensitive because a lot of people know you are about to receive your funds so they will like to get one or two favours from you.
>
> Again, you have to disregard all there (sic) faxes or calls because it will only jeopardize all your invested effort.  The guarantee will be made available to you, your funds will leave three hours after you have made the payment, and the funds cannot be deducted because it is not a bank charge.
>
> Finally, this is the final payment you are to make and nothing, absolutely nothing, will stop you from confirming the funds into your bank account.[29]

However, the funds never arrived in America.  Though they would supposedly move over

the next months to the South African Reserve Bank,[30] similar obstacles arose.[31]  The

---

[29]  *Id.* at 59.

[30]  August 2002 correspondence to Dr. Guillet on the letterhead of this entity stated:

> Following an irrevocable Foreign Fund Transfer Instruction received from the Executive Office of the President of the Federal Republic of Nigeria with reference number FGN/FFX/0036 in favour of Dr. Glen G. Guillet, we advise you on the availability and readiness of the sum of US$41,500,000.00 which is to be wired to below bank account (Regenesis account). . . .
>
> Finally we enclosed (sic) the highly classified Nigerian Consulate Certificate of Merit which confirms you as the legitimate, and bondfide beneficary of the contract funds. You should endeavour to make a general reconfirmation of your bank account urgently hence your full outstanding contract amount of US$41.5 million shall be release via Swift on the 14 day of August, 2002.

*Id.* at 68.

[31]  However, on the very next day, Guillet received an additional message from the South African Reserve Bank:

> Be informed that the effected telegraphic transfer will not be allowed to confirm into your nominated local bank account until a payment of zero point four percent (0.4%) of your total contract amount is paid being the Wire Transfer Charge.  The amount is ... US$41,500.

**-17-**

Nigerian Ports Authority charged $7,200 for additional documents.[32]  Guillet paid.  The

Nigerian Oil Reserve Trust Account (Offshore Payment Unit) assessed $9,200, then

$5,600, then $4,000 arising from various "enforcement" actions.[33]  Guillet paid.

The chance for clearance of the funds were seemingly advanced, however, in

September 2002 when funds were transferred from Johannesburg to the Union Bank of

Switzerland (UBS), which stated it was prepared to pay Guillet the contract sum upon

receipt by Central Bank of Nigeria of $14,542.00 as a Marginal Fluctuation Difference

Charge.[34]  Guillet paid.[35]  More assessments followed.  The focus then turned to London

where Barclay's Bank apparently agreed to facilitate the transfer of the $41.5 million as a

type of escrow for a $4,000 handling charge,[36] but then later refused to tender the funds

without payment of another Marginal Fluctuation Difference Charge ($7,150),[37] an

Exchange Control Disciplinary Allocation ($5,750),[38] a Telex charge ($6,050),[39] as well

---

*Id.* at 70.

[32]  *Id.* at 103.

[33]  *Id.* at 106.

[34]  *Id.* at 92.

[35]  *Id.* at 94.

[36]  *Id.* at 111.

[37]  *Id.*

[38]  *Id.* at 119.

[39]  *Id.* at 120.

**-18-**

as new Nigerian assessments ($5,500),[40] all of which were eventually paid by Guillet.

Guillet hired a Nigerian attorney named Leonard Ibe to try to facilitate the cooperation of

the Nigerian authorities.[41]   The funds purportedly then shifted from London back to the

Union Bank of Switzerland (UBS) where the transaction was subjected to scrutiny by the

Financial Action Task Force (FATF), which was apparently charged with suppressing the

financing of terrorism through Third World countries.  The Regenesis payment was

cleared of terrorist suspicions, but a 0.25% European Community Tax was assessed

(presumably to finance the fine work of the FATF),[42] and Guillet successfully scrambled

to pay this sizable $103,750 tax assessment.[43]   Once the European tax was paid, any

action by UBS to transfer the funds was halted by the Nigerian Presidency,[44] that caused

further delay, and that delay led to an additional $11,125.15 Fluctuational Marginal

Deficit assessment by the Central Bank of Nigeria[45] that was again paid by Guillet.[46]

    That scenario was repeatedly replayed for the next three years.  By February 2004,

Guillet acknowledged to his Nigerian lawyer that his expenditures had exceeded $1

---

[40]  *Id.* at 106.

[41]  *Id.* at 155-58.

[42]  *Id.* at 201-18.

[43]  *Id.* at 219.

[44]  *Id.* at 227.

[45]  *Id.* at 234.

[46]  *Id.* at 239.

million.[47]  In that month, after an anti-corruption investigation into "overbloated" foreign contracts, the Presidency lowered the contract payable to Regenesis to $31.5 million.[48] But the assessments continued to come and Guillet continued to pay them.[49]

Even after the filing of this bankruptcy case in April 2005, Guillet remained committed to obtaining the release of his contract funds.[50]  He paid the Central Bank of Nigeria $17,000 in May 2005 to address currency fluctuations.[51]  He paid $4,000 in November 2005 for a Current External Tariff assessment by the Presidency.[52]  He paid another $9,500 in February 2006 as a banking security fee[53] and struggled to pay $31,500 in May 2006 as a European Union Currency Protection Act fee,[54] after attempts to offset that payment against an earlier rescinded FATF fee of $103,700 were unsuccessful, and written pleas to federal legislators, the United States Ambassador to Nigeria, and the United States Secretary of State,[55] to intervene with the European Union entities were ignored.  And yet the correspondence from the Central Bank of Nigeria and other entities

---

[47]  *Id.* at 267.

[48]  *Id.* at 274.

[49]  *Id.* at 293-296.

[50]  Plaintiff's Ex. 49.

[51]  DCDD, Vol. 1 at 372-73.

[52]  *Id.* at 431-32.

[53]  *Id.* at 444-54.

[54]  *Id.* at 494-502.

[55]  *Id.* at 503-10.

continued to be encouraging.[56]  It was only after a demand by the Chapter 7 Trustee for

Regenesis, Inc., based upon ownership of the asserted receivable, did Dr. Guillet cease his

activities to facilitate the transfer of the $31.5 million from the NNPC.[57]

*The Aftermath.*

Purportedly upon the advice of an IRS collection agent, the Debtors sought relief

under Chapter 7 in April 2005 after the IRS had garnished his bank account and seized his

monthly Social Security income.  The Chapter 7 Trustee, Daniel Goldberg, testified that

the Debtors were cooperative in his attempt to understand what had occurred in regard to

Regenesis. They answered his questions about their now-defunct businesses and they

produced massive amounts of documents to the Trustee about the Nigerian venture.

What the Trustee discovered was that, over the five-year span of Dr. Guillet's

attempts to collect the $31.5 million contract amount from Nigeria, he expended

approximately $1,336,067 in paying the various fines, taxes, assessments and fees that

were assessed via the documentation forwarded to him.  He advanced $411,681 of his

personal funds toward that goal and when his personal assets were exhausted, he solicited

$924,386 from friends who either loaned money to him for such payments or elected to

invest in the Regenesis project through participation agreements with a promise of a

---

[56]  *Id.* at 511-15.

[57]  Plaintiff's Ex. 85.

generous return.[58]  Though he tried to use code words and other methods to insure that only authorized persons could access the payments once received in Nigeria, Dr. Guillet concedes that, in transmitting the funds via Western Union and other informal money transfer programs in obedience to the instructions given to him, he really has no method by which to trace the funds that were transmitted under his direction nor can he identify any tangible benefit at this point which has arisen from his Nigerian business transactions.

Based exclusively upon the foregoing circumstances, including the solicitation of funds from third parties, the United States Trustee argues that such actions should deprive Dr. Guillet of the benefits of a Chapter 7 discharge.[59]  The Plaintiff seeks such relief under the provisions of §§ 727(a)(2)(A), (a)(3), and (a)(5).  The Debtor contends that he never defrauded anyone, that he has provided a full explanation of everything that occurred, and has produced complete records documenting the entire scope of the Regenesis project.

---

[58]  DCDD, Vol. 2 at 34.  Included among the investors was Mrs. Guillet's father and Dr. Guillet's son.  With the exception of one investor who claims to have been solicited on a Mexican project instead of the Regenesis project, the testimony of other investors contained no rancor or animosity against Dr. Guillet, merely understandable disappointment that no return on their money seems likely notwithstanding the trust and confidence that they had shown in the judgment of Dr. Guillet.  The Court notes that all investors who testified at trial did so only under power of subpoena and no investor nor any other creditor has brought an action against either Debtor to determine the dischargeability of any particular debt.

[59]  Such contentions were also asserted against the Debtor's wife and joint debtor, Cheryle Ann Guillet; however, based upon the same standards articulated here, the Court has already ruled in favor of Mrs. Guillet in regard to the relief sought against her.  *See supra* p. 4-6.

## Discussion

Nigerian "advance-fee frauds" are well-documented today.  Though such fraudulent schemes actually began in the 1980s, they exponentially expanded as use of the Internet became more prevalent and e-mail solicitations to unwitting victims could be disseminated more easily without attracting the attention of the legal authorities.  As the schemes became more numerous, even authorities in Nigeria were forced to issue warnings about the dangers posed by the monetary scams.  In fact, the Central Bank of Nigeria issued a press statement in which it acknowledged the widespread publicity regarding so-called "419 scams," however it notes that "there are still some people who have continued to fall victim to the solicitations of advance fee fraudsters.  This warning is, therefore, specifically intended for the benefit of those misguided people who, in the quest to make easy money at the expense of Nigeria, are defrauded by international fraudsters."[60]

The statement from the Central Bank of Nigeria eerily tracks the footsteps of this case and it creates a strong inference that Dr. Guillet is one of the misguided.  It states, in relevant part:

> The advance fee fraud is perpetrated by enticing the victim with a bogus
> "business" proposal which promises millions of US dollars as a reward.
> The scam letter usually promotes to transfer huge amounts of money,

---

[60]  This warning was posted on the website of the United States Postal Inspectors at www.usps.com/websites/depart/inspect/nigpress.jpg.  It was not introduced into evidence and is used by the Court only for illustrative purposes.

usually in US dollars, purported to be part proceeds of certain contracts, to the addressee's bank account, to be shared in some proportion between the parties.  A favourable response to the letter is followed by excuses why the funds cannot be remitted readily and subsequently by demands for proportionate sharing of payments for various "taxes" and "fees," supposedly to facilitate the processing and remittance of the alleged funds. The use of "fake" Government, Central Bank of Nigeria, Nigerian National Petroleum Corporation, etc. documents is a common practice

. . .

To consummate the transaction, the "victim" would be required to pay "advance fees" for various purposes: *e.g.* processing fees, unforeseen taxes, licence fees, registration fees, signing/legal fees, fees for National Economic Recovery Fund, VAT, audit fees, insurance coverage fees, etc. The collection of these "advance fees" is actually the real objective of the scam.

. . .

The Central Bank and indeed, the Federal Government of Nigeria cannot and should not be held responsible for bogus and shady deals transacted with criminal intentions.  As a responsible corporate body, the Central Bank of Nigeria is once again warning all recipients of fraudulent letters on bogus deals, that there are no contract payments trapped in the bank's vaults.  They are once again put on notice that all documents appertaining to the payment, claims, or transfers purportedly issued by the bank, its senior executives, or the Government of the Federal Republic of Nigeria for the various purposes described above are all forgeries, bogus and fraudulent.[61]

---

[61]  *Id.* (emphasis in original).

There is really no evidence in the record to prove or disprove the actual existence of these Nigerian individuals, nor the capacity with which they interacted with Dr. Guillet, the means by which business actually occurs in Nigeria, or the means by which a contract might be properly collected in Nigeria.  Particularly in the light of the Central Bank warning, however, any sound-minded person would have serious reservations as to whether the Nigerian individuals actually exist as represented, and a reasonable person would likely conclude that, in this case, such individuals have perpetrated an enormous fraud upon Dr. Guillet and those who invested with him.

In one sense it is puzzling as to how Dr. Guillet could have become involved in this fiasco.  It is clear from the Court's observations at trial that Dr. Guillet is an intelligent, articulate person who has enjoyed a highly favorable reputation as a family physician in Beaumont for many years.  Even those who appear to have lost money in the Regenesis project consider him a basically honest man, though a terrible businessman, and most still hail him as a wonderful doctor whose services their families still utilize.  He is hardly a man who has taken total leave of his senses.  So how could he get taken in this type of scheme?

The Court is convinced that Dr. Guillet is a person who believes to this day that it is not a fraudulent scheme and that, if he could just be given one more opportunity to overcome the obstacles, he could still be the recipient of $31.5 million from Nigeria that would pay his creditors in full.  His circumstances make him the perfect foil for these

international fraudsters.  As an initial matter, Dr. Guillet believes this transaction was not a scam because it did not begin with an unsolicited letter or e-mail.  It began with an invitation – an invitation from a man that he already knew, or thought he knew – Saíd Bucaros.  Guillet testified that he spent two or three days per week with Bucaros over a 6-month span discussing the advantages and the pitfalls associated with doing business in Nigeria.  He was aware of the corruption and graft.  He was aware of his own naivèty with regard to such matters.  However, he could protect himself by having Bucaros as a mentor, a supervisor, and a guide.  Dr. Guillet's sense of the legitimacy of this project in a surrounding world of cynicism is rooted in his belief in Bucaros.  Unfortunately when this financial ball began to roll, Bucaros was not available, whether intentionally or unintentionally.

Secondly, Dr. Guillet's belief regarding the validity of the opportunity deepened because of the sophistication and detail of the scam.  Even the most [suspicious] of persons would be impressed by the scope and nature of the documents which Guillet received.  While some might not seem consistent with the quality generally required under American business standards, the parties were engaged in a Third World business environment, and the time and effort reflected in the various types of documentation received, not to mention the sheer volume of it, bolstered the constant oral solicitation and encouragement received by Guillet.  He (and his wife) spent hour after hour in teleconferences with these participants in various corners of the world.  This was not a

simple sting based upon an isolated piece of e-mail and, once significant sums had been invested, it was very difficult for Guillet to let go.

Finally, Guillet's stubborn belief in the legitimacy of this project was primarily motivated by his growing desperation for a comprehensive means by which to address his eroding financial circumstances.  As a 70-year-old person with few remaining assets, Dr. Guillet saw only darkness in his financial future for him and for his creditors without the success of the Regenesis project.  He had failed twice in an effort to address an IRS indebtedness  — an assessment he still thinks was unfairly based on non-existent business income from the 1980s prior to his marriage to Cheryle, and an obligation which had been significantly increased by substantial interest and penalties assessed by the IRS after his Chapter 11 plan and his compromise agreement had each failed.[62]  His business reputation was tarnished and many of his lifelong associations had been strained.  Now his Social Security payments were being garnished by the IRS.  His monthly financial obligations had to be conducted with cash and money orders.  The need to remain employed at his age was likely to be a necessity.  A man who had reached 70 with a successful medical practice was not living the life of ease and comfort that he had expected, and he was not providing one for his spouse who had played little, if any, role in his failures.  His retirement assets had been depleted.  A new compromise with the IRS was problematic.

---

[62]  Guillet testified that it was, in fact, an IRS collection agent who advised him to seek Chapter 7 relief in this case as the best method by which to bring the Service back to the negotiating table to hammer out a deal until the Nigerian money arrived.

There was only one desperate possibility — that he could hit a "home run" that would pay the IRS in full, repay all of the loans and investments he had taken from friends and patients, and restore his financial stability and his good name.   Bucaros had assured him that the opportunity was real, but that there would be difficulties along the way due to the Third World business environment.  His numerous conversations with the Nigerians seemed genuine, even friendly at times.  The suspicions otherwise arising from the timing of the obstacles were overcome by the apparent authenticity of the documents and the illusion bolstered by hundreds of phone calls, constantly reassuring him that the obstacles could be overcome and that completion of the monetary transfer was just around the corner.  He undoubtedly cherished the thought that, when the money eventually came through, all of the doubts and innuendos regarding his veracity (and perhaps his sanity) would evaporate in the sunshine of his vindication.  He never believed, and to this day does not believe, that the story is not true.

The sense of bewilderment felt by any outside observer of these circumstances fuels the prosecution of this complaint.  It is axiomatic that the denial of a debtor's discharge is a harsh remedy and the provisions set forth in §727(a) are precisely drawn so as to encompass only those debtors who have not been honest and forthcoming about their affairs. *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."].  Thus, in

order to accomplish that limited purpose, the provisions of §727(a) are to be construed liberally in favor of granting debtors the fresh start contemplated by the Bankruptcy Code and construed strictly against parties seeking to deny the granting of a debtor's discharge. *In re Ichinose,* 946 F.2d 1169, 1172 (5th Cir. 1991); *Melancon v. Jones (In re Jones)*, 292 B.R. 555, 559 (Bankr. E.D. Tex. 2003).  As the Plaintiff seeking such relief, the Plaintiff bears the burden of proving that the Debtor is not entitled to a discharge under §727.  The standard of proof for its claim is a preponderance of the evidence.  *See, e.g., Everspring Enter., Inc. v. Wang (In re Wang)*, 247 B.R. 211, 213-14 (Bankr. E.D. Tex. 2000) ("The standard of proof for allegations ... under §727, is by a preponderance of the evidence.") (*citing Grogan v. Garner*, 498 U.S. 279, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991) and *Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54 (Bankr. E.D. Tex. 1996)).

*Section 727(a)(2)(A).*

The first statutory limitation under which the complaint seeks to deny a discharge to Dr. Guillet is §727(a)(2)(A).  This section provides:

> The court shall grant the debtor a discharge unless —
> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition..."[63]

---

[63]  There is no allegation that Dr. Guillet disposed of estate property in the post-petition period and, to the extent there were post-petition transfers funded with borrowed funds, those amounts do not fall within the scope of the discharge.

In order to prevail under §727(a)(2)(A), there must be evidence of an actual intent to hinder, delay, or defraud creditors — a constructive intent is insufficient. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989); *Lee*, 309 B.R. at 481. However, "a court may infer such actual intent from the circumstances of the debtor's conduct." *NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1059 (5th Cir. 1990) *rev'd*, 932 F.2d 1100 (5th Cir. 1991) (*citing Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 565 (7th Cir. 1989)). Despite the requirement of proof of actual intent, such actual intent may be inferred by looking to several factors:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit, or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003).[64]

---

[64] The Plaintiff cites the Court to factors 1, 4, 5, and 6 as applicable in this case. The above-cited factors are essentially restatements of some of the badges of fraud incorporated into the Uniform Fraudulent Transfer Act. In examining these badges of fraud in a §727(a)(2)(A) context, some courts have noted that the badges of fraud can be categorized into three species: those that are inherently indicative of fraudulent intent, those that suggest a motive other than economic rationality, and those that are only relevant because of their timing. *See Lee*, 309 B.R. at 486, n. 30 (*citing Murphy v. Crater (In re Crater)*, 286 B.R. 756, 764-65 (Bankr. D. Ariz. 2002)). Only factor 3 of those identified by the Fifth Circuit is inherently indicative of a fraudulent intent. Factors 1 and 2 are only indicative of the

The Plaintiff contends that this subsection applies essentially because Dr. Guillet cannot account for the funds once they were delivered to Nigeria and he possesses no assets to show for those expenditures.  Those facts are undeniably true.  That is what makes Dr. Guillet a victim of a scam, but it does not necessarily make him a perpetrator of one.  The Plaintiff wishes the Court to infer that the Debtor transferred the property *for the purpose* of placing assets outside of the reach of his creditors.  However, there is insufficient evidence in the record to support that alleged purpose.  In fact, the Debtor solicited the money from third parties for the *stated purpose* of transferring it to Nigeria.  The testimony of the investors in this case was consistent  –  they tendered the money to Dr. Guillet not because of any statement he made about Nigeria, they tendered the money to him because he asked, *i.e.*, because of the trust engendered either by a long-term friendship or a valued physician-patient relationship.  As for a lack of assets or the lack of control thereof, there is no evidence in the record to suggest that Dr. Guillet had any more control over the funds once transferred than did the affected creditors.  There is no evidence in the record from which a reasonable inference could be drawn that Dr. Guillet will ever again gain the benefit of the transferred funds.  If he could, then the penalty imposed by this subsection would be proper and just.  However, because of his misplaced belief in the legitimacy of the transaction, Dr. Guillet imposed the same effect on himself

---

possibility that the transaction was not economically rational, and factors 4, 5, and 6 are only relevant because of their timing.  While a lack of economic motivation and timing considerations may, in sum, persuade a court of a debtor's intent to hinder, delay, or defraud his creditors, they alone do not mandate such a finding.

as he unfortunately did on his creditors.  He relinquished possession and control of over

$400,000 of his own money in an effort to obtain a successful conclusion to the venture.

Without his underlying (though perhaps horribly fallacious) belief that he and all of his

creditors would receive a financial benefit from the payment of the repeated

"assessments," Dr. Guillet would not have transferred *anybody's* money to Nigeria.  He

endured the ongoing difficulty of the constant "assessments" because he had been initially

warned about them and the aggregate amount of them had cost less than 5% of the

contract amount.  He mistakenly believed that there was a sound financial purpose for the

transfers.  He mistakenly believed that the transfers would accelerate the full payment of

his creditors, not hinder or delay it.  That mistake, however egregious one might wish to

characterize it, is not sufficient to create the presence of actual fraud.  While the evidence

regarding Dr. Guillet's intent with regard to his participation in this affair may be fairly

characterized as foolish, imprudent, or irrational,[65] the evidence is insufficient to establish

---

[65] Though never pled by the Plaintiff, the Court is equally cognizant that, under certain circumstances, a demonstration of one's reckless indifference for the truth can establish a fraudulent intent.  *See, e.g.*, *Sholdra v. Chilmark Financial, LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001) [a false oath case].  However, one must not be reckless with the "reckless disregard" standard, given the fact that liability under §727(a) must be based on an actual fraudulent intent, not merely a constructive one.  The use of reckless indifference as an equivalent for actual fraud has been limited to cases involving the inaccuracy of a debtor's sworn schedules that such debtor has refused to amend, and such failure has been construed as a sufficient demonstration that the debtor does not care whether his statement is true or false.  The evidence in this case conclusively demonstrates the opposite.  First of all, we actually have no evidentiary demonstration of the objective truth in these circumstances – we only suspect that Dr. Guillet was the victim of a scam.  Secondly, Dr. Guillet fervently cared about demonstrating the legitimacy of the Nigerian contract payable.  He was not flippant or disinterested.  Though probably erroneous, such a mistaken mental state is not the equivalent of the mindset under which an actual fraudulent intent has been derived from a pattern of recklessness as in the *Sholdra* line of cases.

that Dr. Guillet engaged in these transfers with an actual intent to hinder, delay, or defraud his creditors.

*Section 727(a)(3).*

Alternatively, the complaint seeks a denial of any discharge to the Debtor under §727(a)(3). That section provides:—

> The court shall grant the debtor a discharge —
> unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transaction might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

A discharge is denied to an individual debtor under this subsection for a failure to preserve documentation from which creditors can ascertain his financial condition and determine the nature of his financial dealings. Individuals who desire the privilege of a discharge are required to provide their creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial accuracy for a reasonable period past to present." *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *see also Broad Nat'l Bank v. Kadison*, 26 B.R. 1015, 1018 (D.N.J. 1983) ["The privilege of a discharge is hinged on disclosure."] and *WTHW Inv. Builders v. Dias (In re Dias)*, 95 B.R. 419, 422 (Bankr. N.D. Tex. 1988) ["Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has

-33-

passed through a debtor's hands."].  It serves as a limitation upon a debtor's right to a

discharge because "[c]reditors are not required to risk having the debtor withhold or

conceal assets 'under the cover of a chaotic or incomplete set of books or records.'"

*Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992).

Under §727(a)(3), a plaintiff must prove that a debtor: (1) failed to keep and

preserve financial records; and (2) that this failure prevented the plaintiff from

ascertaining the debtor's financial condition.  *Dennis*, 330 F.3d at 703.  Intent is not an

element.  The premise of the subsection is that such financial documents would have been

available under normal circumstances except for the failure of the debtor to *maintain or

preserve* them.  If this evidentiary burden is sustained,

> . . . the burden shifts to the debtor to show the inadequacy is justified under
> all of the circumstances.  The Fifth Circuit has never delineated a precise
> threshold beyond which a debtor becomes accountable for further
> recordkeeping.  A debtor's financial records need not contain "full detail,"
> but there should be written evidence of the debtor's financial condition.
> The bankruptcy court has wide discretion in both its initial determination of
> whether the debtor maintained adequate records and the subsequent
> question of whether any failure to do so was justified, and its decisions
> constitute findings of fact reviewed for clear error.

*Cadlerock Joint Venture, L.P. v. Sauntry (In re Sauntry)*, 390 B.R. 848, 855 (Bankr. E.D.

Tex. 2008)(citations and quotations omitted).

The Plaintiff has failed to sustain its burden of proof regarding the applicability of

this subsection.  First of all, the Debtor did not fail to keep and preserve financial records.

Indeed virtually all of the extensive evidence introduced in this case, including that introduced by the Plaintiff, were derived from Dr. Guillet.  This Debtor has not withheld or destroyed any recorded information.  He has instead produced reams of recorded information kept in a fairly systematic way.

Secondly, there has been no failure of recordkeeping by the Debtor that prevents one from ascertaining the Debtor's financial condition.  Indeed there is no mystery about the Debtor's financial condition nor the nature of his financial dealings.  The Debtor's financial condition can best be described as depleted and precarious – all due to the fact that Dr. Guillet has apparently allowed himself to be defrauded by the perpetrators of this extensive hoax from Nigeria.  The set of records here is not incomplete.  Each transfer is documented as to the type and source of the demand which was made and the name of the person to whom Dr. Guillet transferred the money per the given directions.  Of course, there is sufficient reason to believe that those names are fictitious and there appears to be no valid means by which to discover  the true identity and location of those apparent criminals who received the money transferred to Nigeria.  That is the true nature of the Plaintiff's complaint under this subsection.  However, that is the nature of a fraudulent scheme and one can legitimately complain that Dr. Guillet was foolishly victimized by it. However, even the Plaintiff must acknowledge that it is improper to hold  Dr. Guillet liable for a failure to record and retain information that he did not possess, and the Court is satisfied that the Debtor's records in this case have provided to creditors virtually all of

the information that Dr. Guillet possesses about the Regenesis project and the use of funds utilized by him to try to procure the contract payment.  Thus, even had the evidentiary burden shifted to the Debtor under this subsection, any inadequacy of the records of Dr. Guillet regarding the identity and location of Nigerian criminals is sufficiently justified[66] under all of the circumstances of this case because there exists no source from which Dr. Guillet could solicit and record such information.  Accordingly, the Court finds that the evidence is insufficient to establish that Dr. Guillet concealed, destroyed, mutilated, falsified, or failed to preserve any recorded information from which his financial condition might be determined.

*Section 727(a)(5).*

Finally, the complaint seeks a denial of the discharge to Dr. Guillet under §727(a)(5).  That section provides:

> The court shall grant the debtor a discharge, unless —
> the debtor has failed to explain satisfactorily, before determination of denial
> of discharge under this paragraph, any loss of assets or deficiency of assets
> to meet the debtor's liabilities.

A party objecting to a discharge under 11 U.S.C. §727(a)(5) has the initial burden to

---

[66] Considerations regarding whether a "sufficient justification" exists for a debtor's act or omission in this context include: (1) the education, experience, and sophistication of the debtor; (2) the volume of the debtor's business; (3) the complexity of the debtor's business; (4) the amount of credit extended to the debtor or his business; and (5) any other circumstances that should be considered in the interests of justice.  *Sauntry*, 390 B.R. at 855, citing *Meridian Bank*, 958 F.2d at 1230-31.

establish a *prima facie* case that there has been a loss of substantial assets in the case. *Reed*, 700 F.2d at 992.  That has been admitted by the Debtors in this case.  Once a *prima facie* case has been established under §727(a)(5), the burden of going forward with the evidence shifts to the debtor to provide a satisfactory explanation for the loss of assets. *Id.*  However, a satisfactory explanation in the context of this subsection is not the equivalent of a satisfactory result.  "The explanation need not be meritorious to be satisfactory," *Cadlerock Joint Venture II, L.P. v. Robbins (In re Robbins)*, 386 B.R. 636, 643 (Bankr. W.D. Ky. 2008), *citing Great Am. Ins. Co., v. Nye (In re Nye),* 64 B.R. 759, 762-63 (Bankr. E.D.N.C. 1986), and a "lack of wisdom in the debtor's expenditures, by itself, is not grounds for denial of a discharge." *Sauntry*, 390 B.R. at 857.  "The test under §727(a)(5) relates to the credibility of the proffered explanations, not the propriety of the disposition." *In re Bodenstein*, 168 B.R. 23, 34 (Bankr. E.D.N.Y. 1994).  Thus, in this context,

> [t]he word "satisfactorily" . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation – he believes what the [debtors] say with reference to the disappearance or shortage.  He is satisfied.  He no longer wonders.  He is contented.

*Cadle Co. v. Orsini (In re Orsini)*, 2008 WL 3342017 at *5-6 (5th Cir. Aug. 11, 2008), citing *Reed*, 700 F.2d at 993.  Thus, "[t]he proper question the Court must ask under Section 727(a)(5) is what happened to the assets, not why it happened." *Bodenstein*, 168

B.R. at 34.

Under these standards, there has not been an unexplained loss of assets in this case. There is not a dispute as to what happened to the assets. They were transferred to specific individuals in Nigeria and in other locations as directed. Dr. Guillet has been forthcoming about exactly what transpired in the transfer of these assets and he has corroborated his testimony through substantial documentary proof. Without approving of it, this Court believes the explanation offered by the Debtor with reference to the dispersal of these assets. The evidence offered in support of that explanation is credible and satisfactory. That does not mean that anyone should be satisfied with the result of the transfers. Admittedly, the true identity of the perpetrators of this Nigerian scam are probably not known nor are the missing assets likely to be located. The greatest likelihood is that the assets went to fraudulent criminals who plotted and implemented an elaborate scheme to bilk the Debtor out of his money. However, to the extent that such information is unknown, it is unknown to the Debtor as well. Since he has been truthful and credible with regard to the disposition of the assets transferred in this transaction, the Debtor has not violated the proscribed standard of conduct. Thus, the discharge of this Debtor cannot be appropriately denied under 11 U.S.C. §727(a)(5).

## Conclusion

What do we do with a debtor who fervently believes that he is taking the correct course of action for the benefit of both his family and his creditors and, as a result,

unwittingly continues his role as a victim in an apparently fraudulent scam?  That is the case proven at trial.  The Plaintiff urges this Court to punish these Debtors upon the assertion that Dr. Guillet should have known at some point that the transaction was fraudulent and should have discontinued his participation, together with his wife's limited assistance.  Yet the evidence clearly establishes that Dr. Guillet did not believe that the Regenesis project was fraudulent and indeed thought that stopping his participation would eliminate the likeliest means by which he could make his creditors whole.

Admittedly, there is something fundamentally appealing about the concept that when a person owes money to others, that person cannot be allowed the luxury of lunacy.  But that is not the concept that is incorporated into §727(a).  A discharge is denied only for actual, actionable fraud, and that simply does not exist in this case, notwithstanding the degree of frustration which may arise from the facts demonstrated.  The Debtor's behavior in this case is remarkably similar to that of a pathological gambler who, in the face of continuing losses, irrationally feels compelled to continue his gambling because winning the elusive "jackpot" is the only way to repay the debts arising from his gambling.   That behavior is delusional and sad, but it is not fraudulent.

This Court has carefully considered the statutory language of §727(a) and the applicability of the evidence in this case to those standards.  The Court concludes that there is simply is not a statutory provision under §727(a) under which Dr. Guillet can legitimately be denied a discharge.  This perhaps reflects a Congressional wisdom

underlying §727(a) that financial victims, no matter how desperate, foolish, or stupid, should not be financially punished for their ineptitudes. That degree of grace should be applied in this instance.

The Court concludes that the Plaintiff has failed to sustain its burden under §727(a)(2)(A) to prove, by a preponderance of the evidence, that the Debtors effectuated the transfers of property with the intent to hinder, delay, or defraud their creditors. The Court also concludes that the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Debtors' discharge should be denied under the provisions of §727(a)(3) and (a)(5). Accordingly, the request for a denial of a discharge to the Debtors, Dr. Glen E. Guillet and Cheryle Ann Guillet, must be denied.[67]

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[68] pursuant to FED. R. CIV. P. 52, as incorporated into adversary proceedings in bankruptcy cases by FED. R. BANKR. P. 7052. An appropriate judgment will be entered consistent with this opinion.

Signed on 10/29/2008

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[67] Because this decision is reached without consideration of any defense based upon any formal legal distinction between Dr. Guillet and Regenesis, Inc., the Court does not reach the issues of alter ego and single business enterprise raised by the Complaint.

[68] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.